## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA

JANICE PATTERSON
134 Live Oak Lane
Midway, GA 31320,

        Plaintiff,

  v.

TERENCE EMMERT, ACTING SECRETARY
OF THE NAVY, UNITED STATES OF
AMERICA, in his official capacity, 1000 Navy
Pentagon
Washington, DC 20350,

UNITED STATES DEPARTMENT OF THE
NAVY
1000 Navy Pentagon
Washington, DC 20350, and

BOARD FOR CORRECTION OF NAVAL
RECORDS
701 S. Courthouse Road Building
12, Suite 1001
Arlington, VA 22204,

        Defendants.

Civil Action No.: 25-CV-396

## I.    INTRODUCTION

1.      Plaintiff Janice Patterson, a veteran of the United States Navy ("Navy"), brings this

action under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* ("APA"), for judicial review

and correction of an arbitrary and capricious decision of the Board for Correction of Naval Records

("BCNR" or "Board") to unlawfully deny Mrs. Patterson a medical retirement by assigning her

only a 10% disability rating.  In doing so, the Board rejected the advice of the Navy's own medical

professionals and the opinion of the Board's majority.

1

2.    During Mrs. Patterson's service to the United States, Mrs. Patterson was diagnosed with post-traumatic stress disorder ("PTSD"), major depressive disorder ("MDD"), dissociative disorder, and borderline personality disorder, and underwent repeated hospitalizations.

3.    Mrs. Patterson received evaluations from the Navy's Medical Evaluation Board ("MEB") and Physical Evaluation Board ("PEB"), the latter of which assigned her a 30% disability rating and placed her on the Temporary Disability Retirement List ("TDRL") effective April 30, 1998.  On May 3, 1999, Mrs. Patterson received an evaluation by the Department of Veterans Affairs ("VA"), which determined that her service-connected disabilities reflected a 70% disability rating.  The VA's 70% rating remained consistent throughout the entirety of Mrs. Patterson's tenure on the TDRL.

4.    On December 6, 1999, Mrs. Patterson received her first periodic physical examination ("PPE") while on the TDRL.  The PPE determined that, despite some improved functioning, Mrs. Patterson had "not made any good adjustments in her daily life" and recommended that she remain on the TDRL for further observation.

5.    In disregard of the counsel of its own medical examiner, on April 21, 2000, the Navy removed Mrs. Patterson from the TDRL, denying Mrs. Patterson appropriate disability retirement and discharging her from the Navy with a mere 10% disability rating—20% lower than any examining physician had ever recommended—without justification or explanation.

6.    In April 2022, Mrs. Patterson applied to the Board and requested that the Navy correct her record to reflect her placement on the Permanent Disability Retired List ("PDRL"), effective on the date that the Navy removed her from the TDRL, with a combined 70% disability rating.

7.    As part of the Board's review, a Navy physician advisor reviewed Mrs. Patterson's

application and medical records and provided an advisory opinion ("AO").  The AO concluded that "there is sufficient clinical evidence to support [Mrs. Patterson's] claim that she was erroneously removed from the TDRL with a 10% disability rating."  The AO went on to find that the PEB's ultimate decision to reduce Mrs. Patterson's disability rating from 30% to 10% "was not explained in any documentation," and "there was no evidence" that the PEB had even reviewed any of the probative VA examinations or rating decisions before removing Mrs. Patterson from the TDRL.  For these reasons, the AO recommended that the Board correct Mrs. Patterson's naval record to reflect a medical retirement with a combined disability rating of 50%, which is consistent with the VA's ratings plus a minor reduction for some improved functioning.

8.      The Board's majority agreed, noting in substantial detail numerous inconsistencies in the Navy's treatment of Mrs. Patterson and conceding that the actions of the PEB were "arguably arbitrary and capricious."  Contrary to the evidence, in a short six-sentence opinion the minority "recommend[ed] that no corrective action be taken" because the Board should not second guess the past actions of PEB officials.  The Assistant General Counsel of the Board approved the minority recommendation without explanation.

9.      The Board's failure to correct Mrs. Patterson's naval record to a 50% disability rating in contravention of the recommendation of its own medical advisor was arbitrary, capricious, unsupported by substantial evidence, and contrary to law.

10.      Mrs. Patterson seeks, among other relief, an order under 5 U.S.C. § 706 setting aside the Board's decision to uphold the TDRL PEB's 10% rating as arbitrary, capricious, unsupported by substantial evidence and contrary to law.

## II.    PARTIES

11.      Plaintiff Janice Patterson is a veteran of the United States Navy.  Mrs. Patterson served honorably from July 1996 until her placement on the TDRL in April 1998.  In April 2000,

the Navy removed Mrs. Patterson from the TDRL and subsequently discharged her.

12.     Mrs. Patterson is a citizen of the United States and currently lives in the State of Georgia with her husband and children.

13.     Defendant Terence Emmert is the Acting Secretary of the United States Navy and is named solely in his official capacity.  He is the chief officer of the United States Navy, and exercises authority, direction, and control over the United States Navy.  Defendant Emmert is authorized by 10 U.S.C. § 1552 to correct the military record of any former member of the United States Navy when he considers it necessary to correct an error or remove an injustice.  Upon information and belief, Defendant Emmert performs a significant amount of his judicial duties within the District of Columbia.

14.     Defendant United States Department of the Navy is an agency of the United States government.

15.     Defendant Board for Correction of Naval Records is an agency of the United States Department of the Navy, located in Arlington, Virginia.  The Board is a board of civilians established by the Secretary of the Navy which, pursuant to 10 U.S.C. § 1552, considers applications filed before it for the purposes of determining whether an applicant's Navy military record should be changed to correct an error or injustice.

### III.     JURISDICTION AND VENUE

16.     Plaintiff brings this action pursuant to the APA.

17.     This Court has subject matter jurisdiction over Mrs. Patterson's claims pursuant to 28 U.S.C. § 1331 because this case raises federal questions under the laws governing the United States military and the APA. *See also* 10 U.S.C. §§ 1201(b), 1203(b); 5 U.S.C. §§ 701–06.  This Court also has subject-matter jurisdiction under 28 U.S.C. § 1361 because this is an "action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof

4

to perform a duty owed to the plaintiff."

18.     This Court is the appropriate venue pursuant to 28 U.S.C. § 1391(e) because the Secretary of the Navy is an officer of the United States and a substantial part of the acts or omissions giving rise to this lawsuit took place in the District of Columbia.

19.     Plaintiff seeks exclusively declaratory and other equitable relief.  *See* 5 U.S.C. § 702.  Plaintiff seeks a declaration that the Board's denial of Plaintiff's application was arbitrary, capricious, unsupported by substantial evidence, and contrary to law, and an order compelling the Secretary of the Navy to classify Plaintiff's separation from the Navy as medical retirement.

20.     The Board's denial of Plaintiff's application was a final agency action for which there is no other adequate remedy in a court.  *See* 5 U.S.C. § 704.

21.     In accordance with 28 U.S.C. § 2401, this action is brought within six years of the Board's decision.

## IV.    FACTUAL ALLEGATIONS

### A.  Military Disability and Retirement Generally

22.     Title 10, U.S.C., Chapter 61, establishes the military's Disability Evaluation System ("DES"), and provides the secretaries of the military departments with authority to retire or separate service members who are unable to perform their military duties because of a physical disability resulting from either illness or injury.

23.     When a member of the U.S. Armed Forces has one or more disabilities that make the member unfit for continued military service, they are normally separated from service with either a (1) medical separation or (2) medical retirement. This determination turns on the combined disability rating assigned by the military department to the conditions that render the service member unfit for continued service.

24.      If a military department assigns the service member a combined disability rating

5

of 30% or more, then the service member will be medically retired 10 U.S.C. § 1201(a)–(b).  A medical retiree is entitled to, among other things, military health care (TRICARE) for the retiree and the retiree's spouse and minor children, as well as access to military bases, commissary privileges, the right to wear the uniform on appropriate public occasions, space-available travel on military aircraft, disability retirement pay, military funeral arrangements, and burial privileges in national cemeteries.  *Id.* § 1203(a)–(b); *see also id.* § 1212.

**B.  The DES Process**

25.     The DES is initiated by referral and consists of several phases of evaluation and review that result in a final disability determination for a referred individual.  In the Navy, the DES process begins with a commanding officer referring a service member for medical evaluation.  *See* Department of Navy Disability Evaluation Manual, Secretary of the Navy Instruction ("SECNAVINST") 1850.4D §§ 3102, 3106.[1]

26.     If a wound, illness, or injury results in a permanent condition or has long-lasting effects, a service member is then formally referred to the DES by an attending physician.  *Id.* § 3102.

27.     After referral, the first formal phase of the DES process involves review by the MEB" of the service member's medical status and duty limitations.  *See* Department of Defense Instruction (DoDI) 1332.38 § E3.P1.2.1.  The MEB is charged with determining whether any of a service member's mental or physical conditions fail the retention standards set forth by the service member's particular military branch, and the specific reasons why the service member does not meet retention standards.  *See* DoDI 1332.38 §§ E4.A1.1.2.11.1–2.

---

[1] SECNAVINST 1850.4D, promulgated December 1998, was operative at all relevant times of this Complaint.

28.     The MEB does not state a conclusion of unfitness due to physical disability, or assign a disability percentage rating, but instead documents a medical opinion that informs the next phase of the DES process to the extent that it proceeds.  *See* SECNAVINST 1850.4D § 3104(a).

29.     If the MEB determines that none of the service member's conditions fail the retention standards, the member is returned to full duty.  But if the MEB determines that one or more of the service member's medical conditions fail the retention standards, the member is referred to a Physical Evaluation Board ("PEB") within DES. *See* DoDI 1332.38 § E4.A1.1.2.11.4.

**C.  The PEB Process**

30.     The PEB process is responsible for determining a service member's unfitness for duty as a result of disability.  *See* DoDI 1332.38 § E3.P1.3.1.  The PEB process can include a review by an informal board, a formal board, and appellate review, which in the Navy is conducted by the Naval Council of Review Boards for service members who have not yet been discharged or separated, and by the BCNR for service members who have been separated or retired.  *See* SECNAVINST 1850.4D § 5001(a).

31.     Upon referral from an MEB, the PEB process can render a determination of unfitness if evidence establishes that an individual is (i) unable to reasonably perform the duties of his or her office; (ii) represents a medical risk to themselves or to the welfare or safety of others; or (iii) imposes unreasonable requirements on the Department of Defense (DoD) to protect them. *See* DoDI 1332.38 § E3.P3.2.

32.     The PEB's analysis is constrained to whether a service member can reasonably perform the duties as assigned prior to referral into the DES process.  The regulations do not grant the PEB authority to make a fitness determination based on whether a service member can

reasonably perform duties that are outside his or her office, grade, rank, or rating. *See* SECNAVINST 1850.4D § 3304(a)-(d).

33.    The PEB process has four possible outcomes.  In particular, a service member can be found:

    a.  fit for duty;

    b.  unfit for duty, but ineligible for disability benefits;

    c.  unfit for duty and eligible for medical retirement; or

    d.  unfit for duty and eligible for medical separation.  *See* DoDI 1332.38 § E3.P3.

34.    A PEB's disability rating controls whether the service member is medically retired or medically separated.

35.    When a rating is at least 30%, a service member will be "medically retired" with monthly disability retirement pay and other benefits.  *See* 10 U.S.C. § 1201.  When a rating is below 30%, depending on length of service, the service member will generally be "medically separated" with a one-time lump sum severance payment and without additional benefits.  *See id.*

36.    If a service member would be qualified for medical retirement but-for the fact that it cannot be determined that a member's disability is "stable," then the member is placed on the TDRL with retirement pay.  *See* 10 U.S.C. § 1202.  According to the DoD, a disability is "stable" if the "preponderance of medical evidence indicates the severity of the condition will probably not change enough within the next 3 years to increase or decrease the disability rating percentage." *See* DoDI 1332.38 § E3.P6.1.1.

37.    Service members on the TDRL must undergo an examination at least every 18 months to "determine whether there has been a change in the unstable and unfitting condition(s) for which the member was temporarily retired."  10 U.S.C. § 1210(a).  A service member must be

either permanently retired or separated within 5 years of placement on the TDRL. *See id.* § 1210(b).[2]

38.    Pursuant to DoD Directive 1332.38 (1996), a service branch's "assignment of disability ratings shall be based on the Veterans Administration Schedule for Rating Disabilities (VASRD)." DoDD 1332.18 § 3.8; *see also* DoDI § E3.P1.3.4.1.2; E3.P4.6. The DoD Directive also required the development of a program for PEB adjudicators that would include instructions on how to apply the VASRD to their cases. *See* DoDD § 4.27.

39.    Under the VASRD, mental health disabilities like Mrs. Patterson's are evaluated pursuant to 38 C.F.R. § 4.130, the General Formula for Mental Disorders (General Formula). The pertinent provisions provide:

      a. a 70% rating where there is "[o]ccupational and social impairment, with deficiencies in most areas, such as work, school, family relations, judgment, thinking, or mood, due to such symptoms as: suicidal ideation; obsessional rituals which interfere with routine activities; speech intermittently illogical, obscure, or irrelevant; near-continuous panic or depression affecting the ability to function independently, appropriately and effectively; impaired impulse control (such as unprovoked irritability with periods of violence); spatial disorientation; neglect of personal appearance and hygiene; difficulty in adapting to stressful circumstances (including work or a worklike setting); inability to establish and maintain effective relationships;"

      b. a 50% rating where there is "[o]ccupational and social impairment with reduced reliability and productivity due to such symptoms as: flattened affect; circumstantial, circumlocutory, or stereotyped speech; panic attacks more than once a week; difficulty in understanding complex commands; impairment of short- and long-term memory (e.g., retention of only highly learned material, forgetting to complete tasks); impaired judgment; impaired abstract thinking; disturbances of motivation and mood; difficulty in establishing and maintaining effective work and social relationships;"

      c. a 30% rating where there is "[o]ccupational and social impairment with occasional decrease in work efficiency and intermittent periods of inability to perform

---

[2] 10 U.S.C. § 1210(b) was amended on December 23, 2016 to replace "5 years" with "3 years." *See* National Defense Authorization Act for Fiscal Year 2017, Pub. L. 114-328, 130 Stat. 2117 (2016). Five years was the timeframe relevant at Mrs. Patterson's discharge.

occupational tasks (although generally functioning satisfactorily, with routine behavior, self-care, and conversation normal), due to such symptoms as: depressed mood, anxiety, suspiciousness, panic attacks (weekly or less often), chronic sleep impairment, mild memory loss (such as forgetting names, directions, recent events);"

d. and a 10% where there is "[o]ccupational and social impairment due to mild or transient symptoms which decrease work efficiency and ability to perform occupational tasks only during periods of significant stress, or; symptoms controlled by continuous medication." 38 C.F.R. § 4.130, Diagnostic Code 9411 (2013).[3]

40.    The list of symptoms under the rating criteria are examples of symptoms that would warrant the rating but are not exhaustive, and the rating authority need not find all or even some of the symptoms to award a specific rating.  Rather, under 38 C.F.R. § 4.130, the General Formula, the rating authority must conduct a "holistic analysis" that considers all associated symptoms, regardless of whether they are listed as criteria.  *See Bankhead v. Shulkin*, 29 Vet. App. 10, 22 (2017); *see also* 38 C.F.R. § 4.130.

41.    When evaluating a mental disorder, the rating agency shall consider the frequency, severity, and duration of psychiatric symptoms, length of remissions, and the veteran's capacity for adjustment during periods of remission.  38 C.F.R. § 4.126(a).  Where there is a question as to which of two evaluations shall be applied, the higher rating will be assigned if the disability picture more nearly approximates the criteria for that rating, otherwise, the lower rating will be assigned. 38 C.F.R. § 4.7.  Any reasonable doubt regarding the degree of disability will be resolved in favor of the veteran.  38 C.F.R. § 4.3.

**D.  Mrs. Patterson's Disabilities During Service**

42.    Mrs. Patterson enlisted in the United States Navy in July of 1996, serving primarily

---

[3] Effective November 7, 1996, the VA revised the criteria for diagnosing and evaluating psychiatric disabilities.  *See* 61 Fed. Reg. 52, 695 (1996); 38 C.F.R. § 4.130.

in San Diego, California.

43.    On May 18, 1997, Mrs. Patterson was admitted to the San Diego Navy Medical Center's psychiatric unit.  After a two-month hospitalization, the Navy's MEB issued a diagnostic assessment which concluded that Mrs. Patterson suffered from dissociative disorder that was "aggravated by [her] service," categorized her military duty impairment as "severe," and found Mrs. Patterson to be "suicidal."  The MEB noted that Mrs. Patterson "frequently and rapidly oscillated between extreme moods of depression and anger" and "had to be placed in seclusion and given benzodiazepines on several occasions for violent behavior which threatened her safety and property . . . [H]owever, she continued to struggle with passive suicidal ideation stating on the one hand that she was not currently suicidal but on the other that she would kill herself and possibly her husband if discharged from the hospital."  The MEB found no record of incompetency or incapacity prior to this first hospitalization.

44.    The Initial MEB Report concluded that Mrs. Patterson's dissociative disorder failed medical retention standards and elected to refer her to the central PEB.  Mrs. Patterson was placed on medical hold and prohibited from performing her full military duties.

45.    Mrs. Patterson was admitted for a second hospitalization from July 26, 1997 to September 5, 1997 and treated for MDD and Borderline Personality Disorder (BPD).  During her hospitalization, Mrs. Patterson experienced an "increased level of dysphoria and suicidal ideation," attempted to commit suicide, and was placed on medication to mitigate her "self-injurious behavior."  Mrs. Patterson ultimately was admitted for five psychiatric hospitalizations between May of 1997 and March of 1998.

**E.  The PEB found Mrs. Patterson unfit for duty**

46.    The PEB subsequently found that Mrs. Patterson's MDD (single episode) and

11

dissociative disorder related to MDD left her unfit for duty and provided her with a 30% disability rating effective April 29, 1998. The PEB also found that Mrs. Patterson's MDD was not permanent and placed her on the TDRL effective April 30, 1998.

**F. The VA assigned Mrs. Patterson a 70% disability rating**

47.     On November 25, 1998, Mrs. Patterson underwent a VA Compensation and Pension exam that confirmed the prior diagnosis of MDD and also diagnosed her with duty-incurred PTSD (the "First VA Exam"). The VA examiner specifically determined that the "clinical onset of the major depressive disorder and the posttraumatic stress disorder were during active-duty military service." The VA examiner noted that Mrs. Patterson's MDD caused "severe problems with mood swings that are unpredictable in their length and severity," varying from hours to days to weeks, as well as "intense angry feelings, marked isolation from others, chronic feelings of sadness and poor memory and concentration." The VA examiner also indicated that Mrs. Patterson suffered from fitful and interrupted sleep, "poor energy, reduced appetite and weight" loss of up to 10 pounds in a single week. *Id.* Mrs. Patterson informed the VA examiner that she "experienced nightmares two to three times per week [due to her PTSD] . . . frequently ha[d] intrusive thoughts . . . [and] had several flashbacks" that first began during her hospitalization at the Navy Medical Center. The VA noted that, following a suicide attempt, Mrs. Patterson lamented that she "just wanted the nightmares to stop."

48.     On May 3, 1999, the VA issued a 70% disability rating effective from April 30, 1998 for Mrs. Patterson's PTSD and MDD due to the fact that together they caused "deficiencies in most areas."

49.     The VA based its rating decision on Mrs. Patterson's service records as well as the First VA Exam from November 1998. The exam had noted several social and occupation

impairments, including that Mrs. Patterson had "difficulty performing routine chores such as cooking and cleaning because of depression" and did not socialize "except for a few carefully selected individuals." These depressive, anxious, and anti-social behavioral patterns led the VA to rate Mrs. Patterson's PTSD and MDD "together as a single disability because of their close interrelationship" and determine that Mrs. Patterson's condition had not stabilized.

50.    Upon awarding Mrs. Patterson a 70% rating the VA indicated that it would reconsider Mrs. Patterson's rating at a future date to ensure it remained accurate.

### G. Navy Periodic Physical Examination & Removal from TDRL

51.    On December 6, 1999, the Navy provided Mrs. Patterson with a PPE and issued a subsequent report (the "TDRL Report"). The Navy's medical examiner noted that Mrs. Patterson exhibited symptoms that included problems with concentration and frequent nightmares. Despite these continued symptoms, the medical examiner diagnosed Mrs. Patterson's MDD as "resolving," and dissociative disorder as "resolved." Nonetheless, the medical examiner determined that Mrs. Patterson's occupational problems rendered her "unsuitable for further military service" and reiterated a diagnosis of BPD consistent with Mrs. Patterson's second hospitalization. The examining physician "recommended that this service member should continue on [the] TDRL" for further examination. The medical examiner made no mention of Mrs. Patterson's documented PTSD.

52.    On or about January 31, 2000, an informal, three-member PEB ("IPEB") met to review the results of the PPE. The IPEB's Findings and Recommended Disposition Work Card ("Work Card") included signed, handwritten notes made on February 1 from each IPEB member. The signed notes show (i) a clear consensus for transfer to the PDRL, (ii) each IPEB members rationale for that determination, and (iii) their intent to set a "finalize[d] 30%" disability rating,

which is consistent with a permanent medical retirement. However, the Work Card was apparently updated just three days later with the words "Revised" and a 10% disability rating. There is no explanation or justification in the record for this sudden reversal.

53.    On February 4, 2000, the IPEB published its determination, concluding that Mrs. Patterson remained unfit for service due to her MDD and that her condition had sufficiently stabilized to warrant removal from the TDRL with a 10% disability rating (the "Final PEB Determination"). The Final PEB Determination did not explain why the IPEB did not follow the advice of its medical examiner to continue Mrs. Patterson on the TDRL or why Mrs. Patterson's disability rating was reduced to 10% after each member of the IPEB had signed off on a 30% rating mere days before. On April 21, 2000, Mrs. Patterson was discharged from naval service.

### H.    The VA maintained its 70% rating for Mrs. Patterson in 3 subsequent exams

54.    On May 30, 2001, the VA maintained its 70% rating for Mrs. Patterson's PTSD and MDD based on a VA examination from December 20, 2000 (the "Second VA Exam"). The VA's rating decision following the Second VA Exam noted that Mrs. Patterson's MDD symptoms included a 5 on a 0-10 depression scale, suicidal impulses, and mood swings, and stated that Mrs. Patterson occasionally cut herself during regularly recuring sad moods. Similarly, Mrs. Patterson's PTSD symptoms included intrusive thoughts and flashbacks, problems in the marital relationship associated with touching, and social avoidance. The VA did, however, note that some individual symptoms seemed to be improving closer to a 50% disability rating.

55.    The Second VA Exam rating decision also analyzed the discrepancy between the First VA Exam rating decision from November 1998 (which conferred a 70% disability rating) and the TDRL Report from December 1999 (which did not provide a rating, but upon which the Final PEB Determination was based that led to Mrs. Patterson's permanent disability retirement).

The Second VA Exam rating decision contended that Mrs. Patterson showed "some decreased functioning compared to the Navy Board findings, with chronic symptoms of depression with some danger of hurting herself."  According to the VA, the findings from the two VA examinations as well as the Navy's TDRL Report "were consistent with a moderate to serious level of disability," with the disability "most consistent with a 70% evaluation, as there are indications of some suicidal ideation; near-continuous panic or depression affecting the ability to function independently, appropriately and effectively; some impaired impulse control; difficulty in adapting to stressful circumstances; and significant problems in establishing and maintaining effective relationships."

56.    The Second VA Exam rating decision, much like the TDRL PPE, concluded that Mrs. Patterson's mental health disability was not yet stable for permanent rating purposes in 2000 at the time of her removal from the TDRL.  As such, another VA examination was scheduled so that Mrs. Patterson's mental health disability could be re-evaluated.

57.     On November 21, 2002, the VA conducted a third examination, again rating Mrs. Patterson's MDD and PTSD as 70% disabling (the "Third VA Exam").

58.    On April 23, 2007, the VA again rated Mrs. Patterson at 70% for a fourth consecutive time due to her MDD and PTSD, concluding that her 70% disability rating had been consistent since April 30, 1998—nearly 10 years.

**I.  BCNR Appeal**

59.    In April 2022, Mrs. Patterson filed an application with the BCNR requesting that her military records be corrected to reflect a permanent disability retirement with a disability rating of 70% for her unfitting MDD and PTSD, consistent with her TDRL PPE and her four subsequent VA examinations.

60.    As part of the BCNR's review, the Board provided a qualified physician advisor to

issue an AO concerning Mrs. Patterson's request. After a full review of Mrs. Patterson's

application and records, the physician advisor determined:

a. "The IPEB Working Card indicated consensus for discharge to the PDRL at a 30% disability evaluation, and the ultimate change to this final disposition was not explained in any documentation. Additionally, there is no evidence that the December 1999 PPE or the February 2000 IPEB had access to, or reviewed, Petition's November 1998 C&P Examination or the VA's rating decision of May 1999."

b. "Petitioner's in-service records established the primary unfitting condition as Major Depressive Episode with clinical documentation supporting a 30 percent disability rating at the time of discharge to the TDRL. Petitioner has also provided post-discharge evidence of a PTSD diagnosis, when combined with the existing diagnosed MDD, resulted in a VA determination of service-connection and 70 percent disability rating."

c. "The range and severity of these symptoms and their impact on Petitioner's well-being and daily functioning represented a level of impairment best described within the VASRD as 'Occupational and social impairment with reduced reliability and productivity,' which is commensurate with a disability rating evaluation of 50 percent."

61.    The physician advisor recommended that Mrs. Patterson's naval record be

corrected, with a finding that she was unfit due to MDD and provided with a disability rating of

50%.

62.    The Board's majority agreed with the physician advisor and concluded that the

evidence indicated Patterson's removal from the TDRL with a 10% disability rating was "arguably

arbitrary and capricious" and that Mrs. Patterson was the victim of an error or injustice by the

Navy. The Board's majority recommended that Mrs. Patterson's naval record be corrected to

reflect her placement on the PDRL, effective on the date of her removal from the TDRL, with a

finding that she was unfit due to MDD, resulting in a disability rating of 50%.

63.    In reaching its decision, the majority emphasized that the IPEB failed to (i) follow

the Navy medical examiner's recommendation that Mrs. Patterson remain on the TDRL, (ii)

explain why it did not follow the medical examiner's professional recommendation, (iii) indicate

why the conclusion espoused in the IPEB's signed, handwritten notes—that that Mrs. Patterson be placed on the PDRL with a "finalize[d]" disability rating of 30%—was ignored, or (iv) explain the reduction in Mrs. Patterson's disability rating from 30% to 10%. Moreover, the majority indicated that Mrs. Patterson's TDRL DES processing was flawed because the Navy's records were devoid of evidence that supported (a) a 10% disability rating, (b) that Mrs. Patterson's unfitting conditions had stabilized or (c) that removal from the TDRL with a 10% disability rating was actually even recommended by the IPEB. In addition, the majority concluded that in her application to the Board, Mrs. Patterson presented substantial medical evidence that her disabling conditions had not stabilized at the time of discharge (and actually deteriorated over the course of the next year), making the IPEB's determination demonstrably premature. As a result, the Board's own physician advisor, reviewing the entire record in 2023, conclusively determined that "there is sufficient clinical evidence to support Petitioner's claim that she was erroneously removed from the TDRL with a 10 percent disability rating" and made a professional recommendation of a 50% disability rating.

64.    The Board's minority disagreed with the majority, opining in a brief, 6-sentence opinion that the Navy was correct to remove Mrs. Patterson from the TDRL with a 10% disabling rating. The minority summarily stated that it (i) "was not inclined to second guess a reasonable decision made by qualified members of the IPEB" and (ii) found "no evidence or reason to believe that the condition was aggravated by her naval service in any way."

65.    On January 8, 2024, the Assistant General Counsel approved the minority's recommendation without any analysis or explanation.

## V.    CLAIM FOR RELIEF

66.    Plaintiff realleges and incorporates the allegations set forth in paragraphs 1 through 65 hereof, as if fully set forth herein.

67.    The Board's January 8, 2024 decision letter constitutes a final agency action under the APA.   Mrs. Patterson's unsuccessful application to the Board was the last available administrative remedy for review of her separation from the Navy.

68.    The Board's denial of Mrs. Patterson's application is arbitrary, capricious, unsupported by substantial evidence, and contrary to law for the reasons set forth below.

69.    *First*, the Board's minority decision, which was adopted by the Assistant General Counsel, failed to grapple with the substantial contradictory evidence, including that: (i) from November 1998 to April 2007, Mrs. Patterson underwent four separate mental health VA examinations each of which supported a 70% disability rating; (ii) the physician advisor concluded that Mrs. Patterson was improperly removed from the TDRL and that her record should be corrected to reflect a 50% permanent disability rating; and that (iii) the Board's majority concurred with the physician advisor, explicitly noting flaws in the PEB's determination and the lack of analysis.

70.    *Second*, the Board acted arbitrarily, capriciously, without substantial evidence, and in violation of 10 U.S.C. § 1216a and DODI 1332.38 by failing to adhere to the VASRD and applicable precedents established by the Court of Appeals for Veterans Claims.   At a minimum, the evidence presented created reasonable doubt regarding Mrs. Patterson's level of disability, which should have been resolved in her favor in accordance with 38 C.F.R. § 4.3.   Similarly, the Navy's final decision failed to provide the holistic analysis required by *Bankhead v. Shulkin* and 38 C.F.R. § 4.130.   The decision also neglected to evaluate which rating best approximated Mrs. Patterson's overall disability picture.   A proper analysis under 38 C.F.R. § 4.7 would have supported a rating higher than 30%, given the frequency and duration of her psychiatric symptoms and her limited capacity for adjustment during brief remissions.

71.     *Third*, the Board minority's six-sentence opinion, which endorsed the lower disability rating and Mrs. Patterson's medical separation, contained no substantive analysis, nor did it rebut the evidence provided by the majority and physician advisor.  In *Kelly v. United States*, 69 F.4th 887 (Fed. Cir. 2023), the court ruled that an agency must provide a coherent rationale that links its decision to the underlying evidence, citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983), which held that an agency's action is arbitrary if it "offer[s] an explanation . . . that runs counter to the evidence before the agency."  Here, the Assistant General Counsel's approval of the minority opinion without addressing the detailed medical evidence presented reflects an arbitrary endorsement of an unsupported conclusion and a failure to both meet the standard of reasoned decision-making under the APA and evaluate the full administrative record, as required by 10 U.S.C. § 1552(a)(1).

72.     *Fourth*, the Board's minority opinion rests on a rebutted presumption of regularity and circular reasoning.  The minority justified its reliance on the IPEB's 23-year-old decision by invoking the presumption of regularity, arguing it would not "second guess" what it deemed a reasonable decision.  However, this presumption was clearly rebutted by the Navy's own PPE from that time, which stated Mrs. Patterson had "not made any good adjustments in her daily life" and recommended continued placement on the TDRL for further observation rather than the awarding of a permanent rating, 10% or otherwise.  In addition, the Navy's decision to uphold Mrs. Patterson's 10% rating because the original IPEB concluded it correct epitomizes circular reasoning, lacking any independent basis or justification.  Thus, the Assistant General Counsel's endorsement of the presumption of regularity and circular reasoning renders the Board's decision arbitrary and capricious.

73.     For these reasons, the Board's decision to deny Mrs. Patterson's application for

correction of her naval record, in disregard of consistent medical evidence and the cumulative impact of her service-connected disabilities, constitutes an arbitrary and capricious final agency action under 5 U.S.C. § 706.

## VI.    REQUEST FOR RELIEF

74.    WHEREFORE, Plaintiff Janice Patterson respectfully requests that the Court provide the following relief:

a. Find that the Assistant General Counsel's decision to approve the Board's minority recommendation was arbitrary, capricious, not in accordance with law, and unsupported by substantial evidence;

b. Vacate and remand the BCNR's decision with instructions to apply the proper legal standards in assessing Mrs. Patterson's application;

c. Award Mrs. Patterson interests, costs, and attorneys' fees; and

d. Grant such other and further relief this Court deems just and appropriate.

Dated:  February 10, 2025

**PERKINS COIE LLP**

By: s/ Alexander O. Canizares
Alexander O. Canizares, Bar No. 488219
Brandon Thompson, Bar No. 1708592 (*Pro Hac Vice Admission Forthcoming*)
PERKINS COIE LLP
700 13th St. NW Suite 800
Washington, DC 20005-3960
Telephone: +1.202.654.6200
Facsimile: +1.202.654.6211
ACanizares@perkinscoie.com
BThompson@perkinscoie.com

*Attorneys for Plaintiff Janice Patterson*

**NATIONAL VETERANS LEGAL SERVICES
PROGRAM**

By: s/ Rochelle Bobroff
Rochelle Bobroff, Bar No. 420892
Esther Leibfarth, Bar No. 1016515
1100 Wilson Blvd, Suite 900
Arlington, VA 22209
Telephone: +1.202.621.5691
Fax: +1.202.223.9199
rochelle@nvlsp.org
esther@nvlsp.org

*Attorneys for Plaintiff Janice Patterson*

## CERTIFICATE OF SERVICE

I hereby certify that on February 10, 2025 I filed a true and correct copy of the foregoing document with the Clerk of the Court for the United States District Court  of the District of Columbia by using the CM/ECF system.

Dated:  February 10, 2025                    By: s/ Alexander O. Canizares
                                             Alexander O. Canizares